**THIS OPINION IS A PRECEDENT
OF THE T.T.A.B.**

Mailed:
February 21, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Brian Jay Osterberg
_____

Serial No. 78331176
_____

Mark D. Schneider of Gifford, Krass, Groh, Sprinkle,
Anderson & Citkowski, P.C. for Brian Jay Osterberg.

Charlotte K. Corwin, Trademark Examining Attorney, Law
Office 117 (Loretta C. Beck, Managing Attorney).
_____

Before Holtzman, Taylor, and Bergsman, Administrative
Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Brian Jay Osterberg has applied to register **CondomToy**

**condom** (in standard character form) for condoms.[1]  The

application, which was filed on November 21, 2003, was

originally based on applicant's asserted *bona fide*

intention to use the mark in commerce.  The application was

approved by the examining attorney and published for

opposition.  Eventually a notice of allowance issued.  On

April 13, 2005, applicant filed a statement of use,

_____

[1] Applicant disclaimed the exclusive right to use "Condom."

alleging first use anywhere and first use in commerce on January 31, 2004.  On May 16, 2005, the examining attorney issued an Office Action in which she found the specimen submitted in support of the statement of use to be unacceptable because it did not show use of the mark on the goods identified in the application.  Registration was finally refused on that basis.  It is from this refusal that applicant has appealed.

The appeal has been fully briefed.

We affirm.

The sole issue in this appeal is whether the specimen submitted by applicant on April 13, 2005 with his statement of use is acceptable to show use of the mark in connection with the identified goods.

Trademark Rule 2.56 provides, in part:

§2.56 Specimens

(a)  An application under section 1(a) of the Act, an amendment to allege use under §2.76, and a statement of use under §2.88 must each include one specimen showing the mark as used on or in connection with the goods, or in the sale or advertising of the services in commerce.

(b)(1) A trademark specimen is a label, tag, or container for the goods, or a display associated with the goods. The Office may accept another document related to the goods or the sale of the goods when it is not possible to place

the mark on the goods or packaging for
the goods.

Section 45 of the Lanham Act, 15 U.S.C. §1127, states, in part, that:

For purposes of this Act, a mark shall be deemed to be in use in commerce –

(1) on goods when -

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale . . .

The specimen submitted by the applicant is a webpage taken from the Intellx website, which he asserts is a display associated with the goods. An excerpt from the webpage displaying the relevant portion of the specimen is reproduced below. In addition, the applicant submitted a Declaration wherein he attested to the following facts:[2]

---

[2] In response to the December 16, 2005 Office Action, applicant, on February 23, 2006, filed what appears to be a signed draft declaration. Applicant filed a "clean" version of his declaration with his appeal brief. The examining attorney objected to the "clean" version of the declaration on the ground that this version of the declaration is untimely. The examining attorney argues that the record for an application must be complete before the filing of an appeal. 37 C.F.R. §2.142. *See also, In re Norfolk Wallpaper, Inc.,* 216 USPQ 903, 904 (TTAB 1983). The examining attorney's objection is overruled. While the examining attorney is technically correct, the two versions of the declarations are substantively the same. The "clean" version includes nonmaterial edits. Striking the "clean" version of the declaration would simply exalt form over substance.

1. Applicant, the president of Intellx, Inc., authorized Intellx to use the mark "CondomToy condom" in connection with a line of condoms;

2. Applicant has personally attended an estimated 20 sales presentations in which he personally distributed copies of the webpage submitted as a specimen; and,

3. During at least some of those sales presentations, applicant was successful in obtaining orders for condoms.







Applicant argues that the webpage is an acceptable specimen for two reasons:

(1) The specimen has been distributed to prospective customers at sales presentations resulting in sales. "As such, the specimen is and has been used in a manner that created a direct and unambiguous connection in the minds of customers between the mark, the goods and the source of the goods." (Applicant's Brief, p. 2); and,

(2) The Intellx webpage displays the mark, the products, and a means for ordering the products. "Specifically, the website page specimen includes a link entitled 'Where to Buy' at the top of the first page (*i.e.,* page 1 of 3) that connects shoppers to online distributors of the goods. Therefore, as in *Dell* [*In re Dell, Inc.,* 71 USPQ2d 1725, 1727 (TTAB 2004)], "[t]he single webpage is, thus, a point of sale display, a display by which the actual sale is made." (Applicant's Brief, p. 4).

Whether a specimen is a display associated with the goods is a question of fact. *Land's End Inc. v. Manbeck,* 797 F.Supp. 311, 24 UPSQ2d 1314, 1316 (E.D. Va. 1992); *In re Hydron Technologies Inc.,* 51 USPQ2d 1531, 1533 (TTAB 1999); *In re Shipley Co. Inc.,* 230 USPQ 691, 694 (TTAB 1986). The starting point for this analysis is the specimen submitted to show use of the mark.

We must determine whether the specimen is mere advertising or whether, in addition to advertising, the specimen is also a display associated with the goods.

A crucial factor in the analysis is if the use of an alleged mark is at a point of sale location. A point of sale location provides a customer with the opportunity to look to the displayed mark as a means of

> identifying and distinguishing the
> source of the goods.

*Land's End Inc. v. Manbeck, supra, citing In re Shipley Co. Inc., supra.*

In the above-noted cases, the determinative factor was that the mark was used at the point of sale (*i.e.,* the location where the goods could be ordered). In *Land's End,* the specimen of trademark use at issue was a mail order catalog that featured an order form and a telephone number so that a customer could order a product directly from the catalog.

The *Shipley* case involved a mark prominently displayed at a trade show booth where orders for products were taken. The Board likened the trade show booth to a sales counter and concluded that since the mark was prominently displayed, the customer would associate the mark with the products in deciding whether to buy the products.

*Hydron* involved an infomercial aired on QVC, a cable television channel devoted to shopping. Programming on this channel consists of advertising products and offering to send them to viewers who call and order them by telephone. In the infomercial at issue, the mark was displayed three times followed by photographic representations of the products. A telephone number was

displayed during the infomercial for placing an order for the products.

Finally, in a case involving a webpage as a specimen for computer products, the Board held that "a website page which displays a product, and provides a means of ordering the product, can constitute a 'display associated with the goods,' as long as the mark appears on the webpage in a manner in which the mark is associated with the goods." *In re Dell, Inc.,* 71 UPSQ2d 1725, 1727 (TTAB 2004).

Another factor in the analysis of whether a specimen is an acceptable display used in association with the goods is whether the mark is displayed in a such a way that the customer can easily associate the mark with the goods. *In re Dell, Inc., supra* at 1728. *See also, Land's End Inc. v. Manbeck, supra* at 24 USPQ2d 1316 (the prominent display of the mark in the catalog combined with the point of sale nature of the display constitutes a display associated with the goods); *In re Hydron Technologies Inc., supra* at 1534 (the mark was prominently featured in the infomercial three times); *In re Shipley, supra* (the mark was prominently displayed on the trade show booth); TMEP §904.06 ("It must bear the trademark prominently").

As can be seen from applicant's webpage, a package of condoms is prominently featured. The webpage and the

7

package of condoms featured in the webpage prominently display the INSPIRAL trademark.  Also, the Intellx logo is prominently displayed in the upper left-hand corner of the website, as well as the legend "The Condom With Curves" directly below the logo.  Buried in the middle of the text is the purported mark.[3]

**CondomToy condom** is not so prominently displayed in the website that customers will easily associate the mark with the products.  While the mark is printed in bold type, so are the terms **"natural beautiful curves**," **"CRAZY sexual friction!"** and **"my favorite**."  Under these circumstances, prospective customers are likely to view the term "CondomToy" as a descriptive term, advertising puffery, or merely informational (*e.g.,* INSPIRAL condoms have "natural beautiful curves," provide "Crazy sexual friction," and are "my favorite" condom, as well as being a "CondomToy"), rather than as a trademark.[4]  Specifically, because the mark

---

[3]  Even though the mark sought to be registered is "**CondomToy condom**," the mark is displayed as "**CondomToy**™ condom."  Thus, it appears that applicant's mark is actually **CondomToy**.  No objection to the drawing of the mark was raised on this basis, and we have, therefore, not considered this point in our decision.

[4] The mere use of a superscript "tm" cannot transform a nontrademark term into a trademark.  *In re Brass-Craft Manufacturing Co.,* 49 USPQ 1849, 1853 (TTAB 1998); *In re Remington Products Inc.,* 3 UPSQ2d 1714, 1715 (TTAB 1987).  The ™ symbol is not so prominently displayed that it outweighs the informational nature of CondomToy in the text of the webpage.

8

**CondomToy condom** appears as part of the sentence, "That's why Inspiral is also called a **CondomToy**™ condom," the commercial impression that is conveyed, particularly because of the use of the indefinite article "a" before **CondomToy**™ condom," is that **CondomToy condom** is a descriptive term for condoms sold under the Inspiral trademark. Unlike the mark in the *Dell* case where the mark at issue was set out from the surrounding text as the first word in a bullet list, **CondomToy condom** is not so prominent that consumers will recognize it as a trademark for condoms. In fact, viewers of the webpage will have to search through the descriptive text even to find the purported mark. *Cf. In re Aerospace Optics, Inc.,* 78 USPQ2d 1861, 1864)(the manner in which the purported mark is used does not support a finding that consumers would perceive it as a mark); *In re Gilbert Eiseman, P.C.,* 220 UPSQ 89, 90 (TTAB 1983)(purported mark conveys advertising or promotional information rather than identifying and distinguishing source); *In re Royal Viking Line A/S,* 216 UPSQ 795, 797 (TTAB 1982)(purported mark would not be perceived as a source indicator); *In re Morganroth,* 208 USPQ 284, 288 (TTAB 1980)(the purported marks was so obfuscated in the specimen that it was not likely to make any impression on the reader); *In re Dun-Donnelley*

*Publishing Corp.,* 205 USPQ 575, 578 (TTAB 1979)(purported mark would be perceived as a indicia of the contents of the magazine, not as an indicia of source).

With respect to the webpage as a point of purchase display, the webpage does not directly provide a means for ordering the condoms. There is no telephone number or online process for ordering the condoms. Although, the webpage includes a link entitled "Where to Buy," there is no information in the record regarding what that link includes. In his brief, applicant explains that this link connects shoppers to online distributors of the goods. (Applicant's Brief, p. 4). Presumably, this means that applicant provides a list of distributors and a link to their websites. Thus, it does not appear on this record that a purchase can be made directly from the webpage or from the information provided in the webpage. In other words, purchasers will have to access the website of a distributor to make a purchase. In effect, the Intellx webpage is simply an advertisement for condoms. *In re Genitope Corp.,* 78 USPQ2d 1819, 1822 (TTAB 2006) (because applicant's specimen webpage does not provide a means of ordering the product, it is merely informational or promotional material and not acceptable to show trademark use on goods).

In further support of his claim that the use of the mark in the Intellx webpage is a display used in association with the goods, applicant argues that the webpage was used in sales presentations. Applicant attested to the facts that he has "personally attended an estimated 20 sales presentations in the United States," that he has personally handed out copies of the webpage at the sales presentations, and that he was successful in obtaining orders for condoms at the sales presentations.

Based on our review of the record in this case, applicant's webpage is simply advertising or promotional material and it does not constitute a display used in association with the goods. As discussed previously, because the mark is not prominently displayed in the web page, it is unclear whether purchasers of the INSPIRAL condoms at these sales presentations associate "**CondomToy** condom" as a source indicator for condoms.

Moreover, applicant's mere statement that he distributed copies of the webpage at sales presentations is not sufficient to persuade us that the Intellx webpage is a display used in association with the goods. Applicant's declaration lacks sufficient detail to transform the webpage from advertising into a display used in association with the goods. For example, there is no discussion

11

regarding how the applicant used the webpage at sales presentations to make an association between the mark and the products or whether consumers, in fact, associated the mark with the products.  Without sufficient detail, any statement by an applicant that advertising copy has been used in the sale of a product potentially transforms every advertising brochure, flyer, leaflet, etc. into a display used in association with the goods.  Congress did not create the use requirement of a trademark as a "straw man" to be so easily knocked down by a *pro forma* statement that the advertising material displaying the mark is used in connection with actual sales of the product.  The use of advertising material in connection with the sales of a product does not *ipso facto* make it a display used in association with the goods sufficient to support technical trademark use for registration.

We are not stating categorically that advertising and promotional material used at sales presentations can never be considered a display used in association with the goods. However, the mere statement that advertising and promotional materials are used in connection with sales presentations is not sufficient, in and of itself, to transform advertising and promotional materials into displays used in association with the goods.

Because applicant's webpage cannot be considered a point of sale display, the webpage submitted by applicant as a specimen of use is not a display used in association with the goods sufficient to support registration.

Decision:  The refusal to register is affirmed.